Filed 6/24/15  P. v. Savala CA2/3

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>CHRISTOPHER SAVALA,<br><br>    Defendant and Appellant. | B246215<br><br>(Los Angeles County<br>Super. Ct. No. BA338581) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Ronald S. Coen, Judge.  Affirmed as modified.

Joseph Shipp, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Steven D. Matthews and Analee J. Brodie, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant and appellant, Christopher Savala, raises numerous contentions following his conviction of two counts of special circumstances first degree murder, with enhancements for personal firearm use and gang-related felonies.

For the reasons discussed below, the judgment is affirmed as modified.

## BACKGROUND

Viewed in accordance with the usual rules of appellate review (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206), the evidence established the following.

1. *Introduction.*

Defendant Savala killed two unarmed men after learning they belonged to a rival gang. Savala had gone to a house in neutral territory to pick up a friend and he stayed to drink a beer. The two victims, Diego Vargas and Benjamin Renteria, arrived by truck shortly thereafter. There was a brief verbal exchange acknowledging their mutual gang animosity. One of the victims went to park the truck down the street. As the victim was walking back toward the house, Savala rushed up and shot him in the face and chest at close range. The other victim tried to flee, but Savala chased after him and shot him seven times. Savala fled the scene and the gun was never found.

2. *The eyewitnesses.*

    a. *Juan Padilla.*

Juan Padilla testified he spent the day of the shooting, March 31, 2008, with Savala. Padilla knew Savala as "Player," a member of the Orchard Street gang. Padilla himself was not a gang member. On that day, Padilla and Savala drove in Savala's car to somebody's house "to hang out" and "party." There were five or six people outside the house. The atmosphere was friendly and Savala got out of the car to chat with people. Because Padilla did not know any of them, he got himself a beer and went back to Savala's car.

Vargas and Renteria arrived in a truck and pulled up in front of the house. Padilla did not know them. They spoke to Cesar Toscano, one of the people congregated outside the house. Padilla noticed that Savala and at least one of the two newcomers were having a disagreement, but he was too far away to hear what they were arguing about. He

thought Renteria was "mad-dogging"**[1]** Savala.  Toscano spoke to Savala and tried to calm things down.**[2]**  Savala was standing on the sidewalk in front of the house; he told Padilla to move closer to him, so Padilla got out of the car and walked to within a foot or two of him.

Vargas told Renteria to move the truck.  Renteria parked it across the street and then started walking back toward the house.  At that point, Savala "went up to [Renteria] and said, 'Fuck you, homie,' and started shooting."  When Vargas saw Savala shoot Renteria, Vargas screamed, "Fuck you, ese," and began running away.  Savala ran after Vargas and shot him.  Vargas fell to the ground and Savala shot him again.

Savala told Padilla and Toscano to get in his car and he drove to a Jack in the Box.  He threatened to kill them if they said anything about the shootings.  After eating, Savala dropped Toscano off at a bus stop, telling him to "stay quiet."  Savala then drove with Padilla to a friend's house.  Savala and his friend walked off for a few minutes and then returned.  Padilla heard one of them say, "Don't worry about it.  I'll get rid of it."  Later that same day, the police stopped the car and arrested Savala and Padilla.

b. *Cesar Toscano.*

Cesar Toscano knew Savala because they were both originally from the Orchard Street neighborhood.  Toscano was a member of the Orchard Street gang at the time of the shootings.  Toscano testified he thought of Diego Vargas, one of the victims, as his brother-in-law because Vargas was engaged to marry Toscano's sister.

On the day of the shootings, Vargas dropped Toscano and Flores off at Gabriela Gutierrez's house, saying he would return later to pick up Toscano.  However, when Vargas did not return, Toscano called Savala for a ride.  Savala arrived at Gutierrez's house with Padilla.  They had only been there for a few minutes when Vargas drove up.

---

**[1]**     " 'Mad-dogging' is an expression used by gang members to describe certain behaviors, including looking at someone to intimidate them."  (*People v. Torres* (2008) 163 Cal.App.4th 1420, 1423, fn. 2.)

**[2]**     Padilla testified Toscano was "talking to [Savala to], like, maybe, like, change his mind."

Toscano testified, "[A]nd next thing you know [Savala] started gang-banging on my brother-in-law." When Savala asked Vargas and Renteria, "Where are you from?" Renteria answered, "Maywood Locos." Toscano testified that Maywood Locos and Orchard Street were rival street gangs.

At this point, Vargas told Renteria to move the truck, so Renteria parked the truck down the street. As he began walking back toward Gutierrez's house, Savala pulled out a gun and shot Renteria in the chest. Toscano testified Savala then "went after [Vargas] and he started firing the rest of the rounds" at him. Savala ordered Toscano to get into Savala's car and he complied because he was scared. Padilla got into the car, too. Savala drove to Lynwood and "dropped off" the gun. Savala told Toscano he would "get smoked too" if he talked about the shootings.

c. *Recardo Flores.*

The jury heard a recorded police interview between Recardo Flores and Sergeant Cooper. Flores said he had been at Toscano's house when Vargas arrived. They drank some beer and then Vargas dropped them off at Gutierrez's house. At some point, Savala and Padilla drove by and Toscano asked them for a ride. Savala made a u-turn and parked in Gutierrez's driveway. Savala got out and started talking to Flores, Gutierrez, and Toscano while Padilla stayed in the car. A few minutes later, Vargas and Renteria arrived in a truck. Vargas parked the truck in front of Gutierrez's driveway. Savala and Vargas argued. Flores said Savala was "pissed off" at Vargas: "[T]hey had a beef or something" because they were from different neighborhoods. Flores said Renteria was in the Maywood Locos gang and that Vargas used to be in the Maywood Locos gang. Savala was from the Orchard Street gang. Padilla got out of Savala's car at some point after Vargas and Renteria arrived. Vargas told Renteria to move the truck further down the street. As Renteria was coming back, Flores saw Savala run down the sidewalk toward Renteria and pull a gun from the front of his pants.

The following exchange occurred between Flores and Sergeant Cooper regarding Savala's interaction with Padilla just before Savala shot Renteria:

4

"[Flores]:  Gray shirt [i.e., Padilla]?  Well, he was right there.  Like I guess Player [i.e., Savala] told him . . . unlock the car, you know, get the car running.

"[Cooper]:  When . . . does Player tell him this?

"[Flores]:  When he was like about to run.

"[Cooper]:  He yells back at the dude?

"[Flores]:  He's like oh, get ready, get ready, like that.

"[Cooper]:  So what does the guy in the gray shirt do?

"[Flores]:  He just hops [in], I guess to move the car."

Sergeant Cooper then asked Flores to clarify what Savala had said to Padilla just before the shooting:

"[Cooper]:  . . . Before the shooting happens, you hear . . . Player yell at the dude that's in his passenger seat initially –

"[Flores]:  Before he . . . shot him.

"[Cooper]:  Yeah, before he shoots at the other two dudes, 'Hey, get, get ready.'

"[Flores]:  Yeah."

　　　　　d.  *Gabriela Gutierrez.*

Sergeant Cooper had recorded an interview with Gabriela Gutierrez on the day of the shootings that was played for the jury.  Gutierrez said Flores and Toscano had been dropped off at her house by Vargas and Renteria.  Gutierrez was sitting outside with them drinking beer.  When Savala and Padilla drove by, Toscano and Flores flagged them down.  Savala parked, got out of his car, and then stood in the yard drinking a beer and talking to Toscano.  Padilla stayed in the car.  A few minutes later, Vargas and Renteria arrived in a truck.  Toscano approached the truck and spoke to Renteria.  Savala joined them, and he and Renteria argued.  Gutierrez couldn't hear what they were saying but she could tell they were arguing.  Toscano "was telling them to calm down, both of them." Vargas "was telling [Savala] . . . to keep it cool.  Just like, I know that they don't get along but to be friends."  Renteria went to move the truck to the other side of the street, while Vargas kept telling Savala to calm down:

5

"[Cooper]: . . . You heard [Vargas] telling [Savala] just to be cool. We know . . . we don't get along but let's just be cool, be chill.

"[Gutierrez]: Yes."

Gutierrez said Vargas was still trying to calm Savala down, "telling him just be friends. And that's when [Savala] started walking fast, started walking towards [Renteria]." At that point, Flores told Gutierrez to go into the house. As Flores and Gutierrez were moving toward her house, she heard gunshots.

2. *Physical evidence.*

Renteria and Vargas both died from multiple gunshot wounds. Renteria had been shot once in the face and once in the chest, from about 18 inches away. Vargas had been shot a total of seven times, four times in the head; six of those bullets had been fired at him from behind. The murder weapon was never found.

3. *Gang evidence.*

Conrad Chacon of the Huntington Park Police Department testified as a gang expert. He was familiar with the Orchard Street gang. Their primary activities ranged from graffiti to robbery to murder. Orchard Street claimed as its territory the City of Bell and parts of Huntington Park. Its territory bordered the City of Maywood, which was claimed by the Maywood Locos gang. The Maywood Locos and Orchard Street gangs were rivals.

Chacon testified Savala was known as "Player," a member of the Orchard Street gang. A tattoo on Savala's abdomen consisted of initials standing for "Orchard Street Locos." Chacon was asked to consider a hypothetical situation based on the facts of this case: A gunman confronts two members of a rival gang on a residential street in broad daylight, an argument ensues, and the gunman kills one victim at close range and then chases down and kills the other victim. Chacon opined the gunman's actions would benefit his gang because it was "a brazen shooting that occurred in the middle of the afternoon" in a public place. The shooting would enhance the gunman's image within the gang, prove his loyalty, instill fear and anger in the rival gang, and make witnesses reluctant to cooperate with law enforcement for fear of gang retaliation.

6

4. *Conviction and sentence*.

Savala was convicted of two counts of special circumstances first degree murder (multiple murder and gang related), with enhancements for personal firearm use and gang-related felonies. (Pen. Code, §§ 187, 190.2, subds. (a)(3) & (22), 12022.53, 186.22, subd. (b)).[3] He was sentenced to state prison for a term of two consecutive terms of life without possibility of parole for the special circumstance murders, plus two consecutive terms of 25 years to life for the personal firearm use enhancements. The trial court imposed and stayed two 10-year gang enhancement terms. This appeal followed.

## CONTENTIONS

Savala contends: (1) there was insufficient evidence to sustain the first degree murder convictions; (2) there was insufficient evidence to sustain the gang special circumstance and the gang enhancement findings; (3) the trial court erred in refusing to instruct the jury on voluntary manslaughter; (4) the trial court erred in giving the jury a flight instruction; (5) the trial court erred in instructing the jury with CALJIC No. 2.21.2; (6) the trial court erred in giving the standard reasonable doubt instruction, CALJIC No. 2.90; (7) the trial court erred in instructing the jury with CALJIC No. 2.80 (qualifications of expert witness); (8) the trial court erred in admitting evidence of prior inconsistent statements; and (9) there was cumulative error.

## DISCUSSION

1. *Sufficient evidence of first degree murder*.

Savala contends there was insufficient evidence to sustain his two convictions for first degree murder because the prosecution failed to prove premeditation and deliberation. There is no merit to this claim.

---

[3] All further statutory references are to the Penal Code unless otherwise specified.

7

a. *Legal principles.*

"In assessing a claim of insufficiency of evidence, the reviewing court's task is to review the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence – that is, evidence that is reasonable, credible, and of solid value – such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] The federal standard of review is to the same effect: Under principles of federal due process, review for sufficiency of evidence entails not the determination whether the reviewing court itself believes the evidence at trial establishes guilt beyond a reasonable doubt, but, instead, whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. [Citation.] The standard of review is the same in cases in which the prosecution relies mainly on circumstantial evidence. [Citation.] ' "Although it is the duty of the jury to acquit a defendant if it finds that circumstantial evidence is susceptible of two interpretations, one of which suggests guilt and the other innocence [citations], it is the jury, not the appellate court[,] which must be convinced of the defendant's guilt beyond a reasonable doubt. ' "If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment." ' [Citations.]" ' [Citation.]" (*People v. Rodriguez* (1999) 20 Cal.4th 1, 11.)

' "Although it is the duty of the jury to acquit a defendant if it finds that circumstantial evidence is susceptible of two interpretations, one of which suggests guilt and the other innocence [citations], it is the jury, not the appellate court[,] which must be convinced of the defendant's guilt beyond a reasonable doubt. ' "If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment." ' [Citations.]" ' [Citation.]" (*People v. Rodriguez*, *supra*, 20 Cal.4th at p. 11.) " 'An appellate court must accept logical inferences that the [finder of fact] might have drawn from the circumstantial evidence.' [Citation.] 'Before

8

the judgment of the trial court can be set aside for the insufficiency of the evidence, it must clearly appear that on no hypothesis whatever is there sufficient substantial evidence to support the verdict of the [finder of fact].' [Citation.]" (*People v. Sanghera* (2006) 139 Cal.App.4th 1567, 1573.) As our Supreme Court said in *People v. Rodriguez*, *supra*, 20 Cal.4th 1, while reversing an insufficient evidence finding because the reviewing court had rejected contrary, but equally logical, inferences the jury might have drawn: "The [Court of Appeal] majority's reasoning . . . amounted to nothing more than a different weighing of the evidence, one the jury might well have considered and rejected. The Attorney General's inferences from the evidence were *no more inherently speculative* than the majority's; consequently, the majority erred in substituting its own assessment of the evidence for that of the jury." (*Id*. at p. 12, italics added.)

The various types of premeditation and deliberation evidence have been described as follows: "The type of evidence which this court has found sufficient to sustain a finding of premeditation and deliberation falls into three basic categories: (1) facts about how and what defendant did *prior* to the actual killing which show that the defendant was engaged in activity directed toward, and explicable as intended to result in, the killing – what may be characterized as 'planning' activity; (2) facts about the defendant's *prior* relationship and/or conduct with the victim from which the jury could reasonably infer a 'motive' to kill the victim, which inference of motive, together with facts of type (1) or (3), would in turn support an inference that the killing was the result of 'a pre-existing reflection' and 'careful thought and weighing of considerations' rather than 'mere unconsidered or rash impulse hastily executed' [Citation.]; (3) facts about the nature of the killing from which the jury could infer that the *manner* of killing was so particular and exacting that the defendant must have intentionally killed according to a 'preconceived design' to take his victim's life in a particular way for a 'reason' which the jury can reasonably infer from facts of type (1) or (2). [¶] Analysis of the cases will show that this court sustains verdicts of first degree murder typically when there is evidence of all three types and otherwise requires at least extremely strong evidence

of (1) or evidence of (2) in conjunction with either (1) or (3)." (*People v. Anderson* (1968) 70 Cal.2d 15, 26-27.)

The *Anderson* categories " 'are descriptive, not normative.' [Citation.] They are simply an 'aid [for] reviewing courts in assessing whether the evidence is supportive of an inference that the killing was the result of preexisting reflection and weighing of considerations rather than mere unconsidered or rash impulse.' [Citation.]" (*People v. Cole* (2004) 33 Cal.4th 1158, 1224.)

> b. *Discussion*.

There was strong motive evidence in this case. Savala believed the victims were from a rival gang. After some initial verbal animosity between Savala and Renteria due to this rivalry, Toscano and Vargas tried to defuse the situation by telling them to calm down. Vargas asked Savala to put aside their gang rivalry for the moment and behave in a friendly manner. When Savala subsequently killed Vargas and Renteria, a reasonable inference was that he had done so because he could not put aside their gang rivalry.

The manner of the killings also tended to show premeditation and deliberation. Savala argues "the evidence . . . does not demonstrate an exacting manner of killing, only multiple acts of violence, and this has never been held sufficient to show premeditation." We disagree. The evidence showed Savala ran down the sidewalk toward an unsuspecting Renteria, pulled a gun from his pants, and shot Renteria in the chest and the face from a fairly close range. When Vargas reacted to this shooting by screaming at Savala and trying to flee, Savala ran after him, shot him several times and then, after Vargas fell to the ground, walked up and shot him several more times. This does demonstrate an exacting manner of killing; it was the pedestrian equivalent of a drive-by shooting during which Savala fired nine times at the victims. (See *People v. Silva* (2001) 25 Cal.4th 345, 369 ["The manner of killing – multiple shotgun wounds inflicted on an unarmed and defenseless victim who posed no threat to defendant – is entirely consistent with a premeditated and deliberate murder."]; *People v. Herrera* (1999) 70 Cal.App.4th 1456, 1464, disapproved on other grounds in *People v. Mesa* (2012) 54 Cal.4th 191

10

[dozen shots fired during drive-by shooting was evidence of premeditation and deliberation].)

Savala argues the evidence showed only "a spontaneous, fast-occurring" explosion of violence "evincing intent to kill or disable, but not a carefully weighed or deliberated gang attack or a plan to kill." However, " '[t]he process of premeditation and deliberation does not require any extended period of time. "The true test is not the duration of time as much as it is the extent of the reflection. Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly. . . . " [Citations.]' " (*People v. Koontz* (2002) 27 Cal.4th 1041, 1080.) "Premeditation can be established in the context of a gang shooting even though the time between the sighting of the victim and the actual shooting is very brief. [Citation.]" (*People v. Sanchez* (2001) 26 Cal.4th 834, 849.)

There was even some evidence of planning because Flores told the police that, just before Savala ran toward Renteria, he told Padilla to "get ready, get ready." The jury could have reasonably inferred this showed that Savala had formulated a plan to attack the victims, warned his friend Padilla that he was about to take action, and then launched his attack. (See, e.g., *People v. Sanchez*, *supra*, 26 Cal.4th at p. 849, italics added [" 'A studied hatred and enmity, including a *preplanned*, purposeful resolve to shoot anyone in a certain neighborhood wearing a certain color, evidences the most cold-blooded, most calculated, most culpable, kind of premeditation and deliberation.' "].) That Savala then fled the scene and disposed of the gun also tended to establish premeditation and deliberation. (See, e.g., *People v. Perez* (1992) 2 Cal.4th 1117, 1128 ["the conduct of defendant *after* the stabbing . . . would appear to be inconsistent with a state of mind that would have produced a rash, impulsive killing"].)

Because the evidence supported an inference that Savala's killing of the victims " 'was the result of preexisting reflection and weighing of considerations rather than mere unconsidered or rash impulse,' " there was sufficient evidence of premeditation and deliberation. (*People v. Cole*, *supra*, 33 Cal.4th at p. 1224.) Hence, there was substantial evidence to support Savala's first degree murder convictions.

11

2. *Insufficient evidence to sustain the gang enhancements and the gang special circumstance findings.*

Savala contends the gang enhancements and the gang special circumstance findings must be stricken because they were not supported by sufficient evidence. This claim has merit.

Section 186.22, subdivision (b)(1), imposes additional punishment when a defendant commits a felony "for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members." To establish that a group is a criminal street gang within the meaning of this statute, the People must prove the group is an "ongoing organization, association, or group of three or more persons, whether formal or informal, having as one of its primary activities the commission of one or more [enumerated] criminal acts . . . , having a common name or common identifying sign or symbol, and whose members individually or collectively engage in or have engaged in a pattern of criminal gang activity." (§ 186.22, subd. (f).) A " 'pattern of criminal gang activity' means the commission of . . . two or more [enumerated] offenses, provided at least one of these offenses occurred after the effective date of this chapter and the last of those offenses occurred within three years after a prior offense, and the offenses were committed on separate occasions, or by two or more persons." (§ 186.22, subd. (e).)

The criminal street gang special circumstance statute, section 190.2, subdivision (a)(22), provides: "The penalty for a defendant who is found guilty of murder in the first degree is death or imprisonment in the state prison for life without the possibility of parole if one or more of the following special circumstances has been found . . . to be true: . . . The defendant intentionally killed the victim while the defendant was an active participant in a criminal street gang, as defined in subdivision (f) of Section 186.22, and the murder was carried out to further the activities of the criminal street gang."

Thus, both the criminal street gang enhancement and the criminal street gang special circumstance require proof of a "pattern of criminal gang activity," i.e., "the

12

commission of . . . two or more [enumerated] offenses, provided at least one of these offenses occurred after the effective date of this chapter and the last of those offenses occurred within three years after a prior offense, and the offenses were committed on separate occasions, or by two or more persons." (§ 186.22, subd. (e).)

In the case at bar, other than the charged offenses, the only evidence of an enumerated predicate crime was an auto theft committed by an Orchard Street gang member in January 2005, more than three years before the charged March 2008 murders. The Attorney General does not dispute Savala's contention that this 2005 offense was too old to qualify as a predicate offense for establishing a pattern of gang activity, or that proof of an existing "criminal street gang" depended solely on the currently charged offenses. Savala argues the evidence failed to show "the offenses were committed on separate occasions, or by two or more persons" (§ 186.22, subd. (e)), to which the Attorney General replies, "To be sure, the murders were not committed by two or more persons. They were, however, committed on separate occasions within the meaning of Penal Code section 186.22, subdivision (e)."

The Attorney General asserts the "separate occasions" test was satisfied based on *In re Jose T.* (1991) 230 Cal.App.3d 1455, 1462-1463, which reasoned: "Although 'separate occasions' is not defined in section 186.22, subdivision (e) for purposes of a criminal street gang sentence enhancement, we may look to section 667.6, subdivision (d), for guidance. Section 667.6, subdivision (d), provides for mandatory full consecutive sentencing where certain sexual offenses involve the same victim on 'separate occasions.' 'Separate occasions,' in the sexual offense arena, is defined as follows: 'In determining whether crimes against a single victim were committed on separate occasions . . . , the court shall consider whether, between the commission of one sex crime and another, the defendant had a reasonable opportunity to reflect upon his or her actions and nevertheless resumed sexually assaultive behavior.' " Based on this reasoning, the Attorney General argues Savala's "two murders were committed on separate occasions" because "the evidence established that [he] premeditated both of the killings. He therefore necessarily had an opportunity to reflect between shooting

13

Renteria in the face at close range, and chasing after Vargas to shoot him in the back and then as he lay on the ground."

However, as Savala points out, there are two very good reasons for rejecting the Attorney General's reliance on *In re Jose T.* First, the two crimes in that case had been committed *hours apart* and in two entirely different locations.[4] Here, on the other hand, the two crimes were committed only seconds apart and within close proximity of each other. Second, the basis for *In re Jose T.*'s holding was subsequently called into question by our Supreme Court in *People v. Deloza* (1998) 18 Cal.4th 585, where the court construed the words "not committed on the same occasion" that appear in the Three Strikes statute.[5]

*Deloza* explained: "[I]t is not clear how helpful the term 'separate occasions,' as defined in section 667.6, subdivision (d), is in interpreting the phrase 'not committed on the same occasion' in [section 1170.12,] subdivision (a)(6) . . . . In addition to section 667.6, subdivision (d), at the time section 1170.12 was enacted, the Legislature had used the term 'separate occasions' in numerous other statutes in the Penal and other codes. It is apparent that these statutes do not consistently use the term 'separate occasions' to refer to either the intent and objective of the defendant or the temporal proximity between the relevant events. Thus, even if the electorate intended the term 'not committed on the same occasion' to have the same meaning as the phrase 'separate occasions,' it is not clear 'separate occasions' has a consistent meaning. In particular, it is not at all clear the electorate was focusing on the meaning of that term as used in section 667.6,

---

[4]     As the court explained: "Here, Cooper was the victim of the robbery which took place at approximately 1:30 a.m. The robbery was committed by Florencia Treca gang members [in the parking lot of a food market] for purposes of the later drive-by shooting. Avila was the victim of the attempted murder which took place more than eight hours later [near a junior high school]." (*In re Jose T.*, *supra*, 230 Cal.App.3d at p. 1463.)

[5]     Section 1170.12, subdivision (a)(6), provides: "If there is a current conviction for more than one felony count *not committed on the same occasion*, and not arising from the same set of operative facts, the court shall sentence the defendant consecutively on each count pursuant to this section." (Italics added.)

14

subdivision (d).  Nothing in the ballot pamphlet or even the legislative history of the Legislature's version of the three strikes law supports such a conclusion." (*People v. Deloza*, *supra*, 18 Cal.4th at pp. 597-598, fn. omitted.)  Specifically addressing the "pattern of gang activity" language in section 186.22, and dismissing *In re Jose T*. with a "but see" citation, *Deloza* said "section 667.6, subdivision (d)'s definition of [the term 'separate occasions'] is of only marginal assistance . . . in construing the meaning of the phrase ' "not committed on the same occasion.' "  Here, the crimes were so closely related in time and space, and committed against the same group of victims, that these factors alone compel us to conclude they occurred on the 'same occasion.' " (*Id.* at p. 599.)

As a result, we agree with Savala there was insufficient evidence to establish the "pattern of criminal activity" element of the gang statute,[6] which in turn means there was necessarily insufficient evidence to prove *either* the street gang enhancement allegations under section 186.22 *or* the street gang special circumstance allegations under section 190.2, subdivision (a)(22).  We will, therefore, vacate those findings and their ensuing sentences.

3.  *Voluntary manslaughter instructions were not required.*

Savala contends the trial court erred in refusing to instruct the jury on either heat-of-passion voluntary manslaughter or imperfect self-defense voluntary manslaughter as lesser included offenses of first degree murder, and in refusing to admit evidence supportive of those theories.  There is no merit to this claim, which is impliedly premised on an assertion the jury should have applied a "reasonable gang member" standard.

---

[6]    As a result of this conclusion, we need not address some of Savala's other gang-related claims:  that the trial court erred in not defining for the jury the language "in association with a criminal street gang," that there was insufficient evidence of the "primary activity" and "active participant in a criminal street gang" elements (§§ 186.22, subd. (f), 190.2, subd. (a)(22)), and that the trial court imposed the wrong penalty in connection with the gang enhancement findings.

a. *Legal principles.*

A trial court must instruct on a lesser included offense if there is sufficient evidence to support a finding by the jury that the lesser offense was committed rather than the greater. (*People v. Breverman* (1998) 19 Cal.4th 142, 154-163.) The lesser included offense evidence must be of some weight, however; the existence of "*any* evidence, no matter how weak*" will not justify instructions on lesser offenses. (*Id.* at p. 162.)

"An intentional, unlawful homicide is 'upon a sudden quarrel or heat of passion' (§ 192(a)), and is thus voluntary manslaughter [citation], if the killer's reason was actually obscured as the result of a strong passion aroused by a 'provocation' sufficient to cause an ' "ordinary [person] of average disposition . . . to act rashly or without due deliberation and reflection, and from this passion rather than from judgment." ' . . . . [T]he passion aroused need not be anger or rage, but can be any ' " '[v]iolent, intense, high-wrought or enthusiastic emotion' " ' [citation] *other than revenge* [citation]." (*People v. Breverman*, *supra*, 19 Cal.4th at p. 163, italics added.) "The provocative conduct by the victim may be physical or verbal, but the conduct must be sufficiently provocative that it would cause an *ordinary person of average disposition to act rashly or without due deliberation and reflection*." (*People v. Lee* (1999) 20 Cal.4th 47, 59, italics added.)

Thus, "[t]he heat of passion requirement for manslaughter has both an objective and a subjective component. [Citation.] The defendant must actually, subjectively, kill under the heat of passion. [Citation.] But the circumstances giving rise to the heat of passion are also viewed objectively. As we explained long ago . . . 'this heat of passion must be such a passion as would naturally be aroused in the mind of an ordinarily reasonable person under the given facts and circumstances,' because 'no defendant may set up his own standard of conduct and justify or excuse himself because in fact his passions were aroused, unless further the jury believe that the facts and circumstances were sufficient to arouse the passions of the ordinarily reasonable man.' [Citation.]" (*People v. Steele* (2002) 27 Cal.4th 1230, 1252-1253.)

16

"Under the doctrine of imperfect self-defense, when the trier of fact finds that a defendant killed another person because the defendant *actually* but unreasonably believed he was in imminent danger of death or great bodily injury, the defendant is deemed to have acted without malice and thus can be convicted of no crime greater than voluntary manslaughter." (*In re Chrisitan S.* (1994) 7 Cal.4th 768, 771.) "[T]he doctrine is narrow. It requires without exception that the defendant must have had an *actual* belief in the need for self-defense. . . . ' "[T]he peril must appear to the defendant as immediate and present and not prospective or even in the near future. *An imminent peril is one that, from appearances, must be instantly dealt with.*" ' . . . [¶] We also emphasize that whether the defendant actually held the required belief is to be determined by the trier of fact based on all the relevant facts. It is not required to accept the defendant's bare assertion of such a fear. . . . Finally, we reiterate that, just as with perfect self-defense or any defense, '[a] trial court need give a requested instruction concerning a defense *only if there is substantial evidence to support the defense.*' [Citation.]" (*Id*. at p. 783.)

   b. *Discussion*.

  The verbal interaction between Savala and the victims prior to the shootings could not have been an adequate provocation for heat-of-passion voluntary manslaughter. (See *People v. Manriquez* (2005) 37 Cal.4th 547, 586 [calling defendant a "mother fucker" and daring him to use his weapon, if he had one, "plainly were insufficient to cause an average person to become so inflamed as to lose reason and judgment."].) Savala is not entitled to a different standard of reasonableness just because he belonged to a gang. (See *People v. Humphrey* (1996) 13 Cal.4th 1073, 1087 [indicating disapproval of hypothetical reasonable gang member standard]; *People* v. *Lucas* (1997) 55 Cal.App.4th 721, 740 [receiving hard looks or so-called "mad-dogging" does not constitute reasonable provocation to shoot someone].)

  In addition, Savala was not entitled to an imperfect self-defense instruction because there was no substantial evidence he "*actually* . . . believed he was in imminent danger of death or great bodily injury." (*In re Christian S.* (1994) 7 Cal.4th 768, 771; see *People v. Minifie* (1996) 13 Cal.4th 1055, 1065 [defendant claiming self-defense must

" ' "prove his own frame of mind" ' "].) Savala did not testify to his own state of mind. The evidence showed that, although Savala initially argued with one or both of the newcomers, others who were present urged the disputants to be friendly despite their gang rivalry. Savala was the only one who ignored this well-meaning attempt to avoid trouble. In these circumstances, there was no evidence he believed he was in imminent danger.

Notwithstanding Savala's arguments to the contrary, evidence showing Renteria had been intoxicated or on drugs or that Savala had once been the victim of a shooting would not have advanced either theory. Savala asserts Renteria's intoxication and drug use constituted "important objective circumstantial corroboration supporting the key defense claim the decedents were aggressors." However, what mattered was the decedents' actual behavior, not whether that behavior might have been affected by drugs or alcohol, and the evidence showed it was only Savala whose behavior escalated from verbal hostility to physical violence.

The mere fact that someone had shot and wounded Savala sometime in the past did not provide substantial evidence he believed that he was now in imminent peril, particularly as there was no evidence connecting his victims to the earlier shooting or suggesting that his victims were armed. Savala argues "the fear of explosive violence was a real concern on appellant's part, as shown by what happened here." However, that is like the proverbial parent-killer requesting mercy because he is an orphan. "What happened here" – so far as the trial evidence showed – was that Savala refused to abandon his gang animosity for even a few minutes and made the decision to eliminate his enemies.

The trial court did not err in finding the evidence did not warrant jury instructions on either heat-of-passion voluntary manslaughter or imperfect self-defense voluntary manslaughter.

4. *The instruction regarding Savala's flight was proper.*

Savala contends the trial court erred in instructing the jury that evidence of flight could be interpreted as a manifestation of guilt. We disagree.

18

a. *Legal principles.*

The jury was instructed with CALJIC No. 2.52 as follows: "The flight of a person immediately after the commission of a crime, or after he is accused of a crime, is not sufficient in itself to establish his guilt. It is a fact which, if proved, may be considered by you in the light of all the other proved facts in deciding whether a defendant is guilty or not guilty. The weight to which this circumstance is entitled is a matter for you to decide." Section 1127c requires a trial court to give this instruction "[i]n any criminal trial or proceeding where evidence of flight of a defendant is relied upon as tending to show guilt."

Regarding the usual group of consciousness of guilt instructions – which includes CALJIC No. 2.06 (efforts to suppress evidence), CALJIC No. 2.52 (flight after a crime) and CALJIC No. 2.03 (telling of a falsehood) – *People v. Jurado* (2006) 38 Cal.4th 72, explained: "We have repeatedly rejected contentions that these standard jury instructions on consciousness of guilt were impermissibly argumentative or permitted the jury to draw irrational inferences about a defendant's mental state during the commission of the charged offenses. [Citations.]" (*Id.* at p. 125.)

"In general, a flight instruction 'is proper where the evidence shows that the defendant departed the crime scene under circumstances suggesting that his movement was motivated by a consciousness of guilt.' [Citation.] ' "[F]light requires neither the physical act of running nor the reaching of a far-away haven. [Citation.] Flight manifestly does require, however, a purpose to avoid being observed or arrested." ' [Citation.]" (*People v. Bradford* (1997) 14 Cal.4th 1005, 1055.) "A flight instruction is proper whenever evidence of the circumstances of defendant's departure from the crime scene . . . logically permits an inference that his movement was motivated by guilty knowledge. [Citations.]" (*People v. Turner* (1990) 50 Cal.3d 668, 694.)

b. *Discussion.*

Savala argues this instruction was "irrational and unfair as an inference of guilt of murder versus other separate crimes (notably unlawful possession of a firearm), much less the degree of murder. Any flight activity by appellant said nothing about the nature

19

or *degree* of his guilt or about *which* crime(s) he was fleeing from." Savala suggests that he "could have fled simply for being present with a gun."

Both of these arguments have already been rejected by our Supreme Court. As for Savala's "degree of the crime" argument: "Contrary to defendant's claims, the instructions do not suggest that evidence of a defendant's consciousness of guilt serves to support an inference of the existence of a particular mental state or degree of culpability. [Citation.] '[W]e have repeatedly rejected the argument that instructions on consciousness of guilt, including instructions regarding the defendant's flight following the crime, permit the jury to draw impermissible inferences about the defendant's mental state, or are otherwise inappropriate where mental state, not identity, is the principal disputed issue.' [Citation.]" (*People v. Martinez* (2009) 47 Cal.4th 399, 450.)

Further, our Supreme Court has repeatedly held that it is up to the jury to sort out the reason why a defendant fled. (See *People v. Mendoza* (2000) 24 Cal.4th 130, 180 [where defendant had been charged with four different crimes arising out of his encounter with the victim – rape, robbery, arson and murder – "[i]t is for the jury to determine to which offenses, if any, the inference should apply"]; *People v. Perry* (1972) 7 Cal.3d 756, 772, disapproved on other grounds in *People v. Green* (1980) 27 Cal.3d 1, 28 [rejecting claim defendant may have been fleeing for reasons other than the charged murder (e.g., arrest warrant, drugs hidden in car trunk, parole violation) because "it is the jury's function to determine which of several possible reasons actually explains why a defendant fled"]; *People v. Armstrong* (1896) 114 Cal. 570, 574 ["True, there was evidence to show that before the theft of the horse the defendant was, as he put it, 'taking precautions to avoid running into an officer,' being apprehensive of arrest for some breach of the peace, and his flight might have been ascribed to such apprehension; but this was a circumstance for the jury; they were not bound to attribute the consciousness of guilt indicated by flight to one disposing cause rather than the other."].)

The trial court did not err in giving a flight instruction.

5. *It was not error to instruct with CALJIC No. 2.21.2.*

Savala contends the trial court erred in instructing the jury with CALJIC No. 2.21.2 (witness willfully false) because it lowered the prosecution's burden of proof. As Savala concedes, however, our Supreme Court has already rejected this contention.

CALJIC No. 2.21.2 provides: "A witness, who is willfully false in one material part of his or her testimony, is to be distrusted in others. You may reject the whole testimony of a witness who willfully has testified falsely as to a material point, unless, from all the evidence, you believe the probability of truth favors his or her testimony in other particulars."

Our Supreme Court has repeatedly rejected the claim that the "probability of truth" language in this instruction "impermissibly lightened the prosecution's burden of proof, because it allowed the jury to assess prosecution witnesses by seeking only a probability of truth in their testimony . . . ." (*People v. Guerra* (2006) 37 Cal.4th 1067, 1139, disapproved on other grounds in *People v. Rundle* (2008) 43 Cal.4th 76, 151; see also *People v. Nakahara* (2003) 30 Cal.4th 705, 714 ["Defendant contends [CALJIC No. 2.21.2] 'allowed the jury to assess prosecution witnesses by seeking only a probability of truth in their testimony.' But as we have held, the targeted instruction says no such thing."].)

The trial court did not err in instructing the jury with CALJIC No. 2.21.2.

6. *The reasonable doubt instruction was proper.*

Savala contends California's standard instruction defining the "beyond a reasonable doubt" standard was constitutionally defective because of its reliance on the phrase "abiding conviction." There is no merit to this claim.

Savala's jury was instructed with CALJIC No. 2.90: " 'Reasonable doubt' is defined as follows: [¶] It is not a mere possible doubt, because everything relating to human affairs is open to some possible or imaginary doubt. It is that state of the case, which, after the entire comparison and consideration of all the evidence, leaves the minds

21

of the jurors in that condition that they cannot say they feel an abiding conviction of the truth of the charge."

Attacks on the "abiding conviction" language have been repeatedly rejected. "[D]efendant's assertions on the deficiencies of the phrase 'abiding conviction' must give way to the great weight of legal authority approving that very language." (*People v. Stone* (2008) 160 Cal.App.4th 323, 334; accord, *People v. Zepeda* (2008) 167 Cal.App.4th 25, 31, fn. 4 ["Our state Supreme Court and the Courts of Appeal in every appellate district consistently rejected defendant's argument as it applied to the 'abiding conviction' phrase in CALJIC No. 2.90."]; *People v. Carillo* (2008) 163 Cal.App.4th 1028, 1039 [rejecting objection to "abiding conviction" language because "the propriety of the instruction . . . has been upheld many times"]; see also *People v. Lucas* (2014) 60 Cal.4th 153, 297 ["we have repeatedly held that the standard CALJIC jury instruction defining reasonable doubt is correct and adequate"].)

The trial court did not err in instructing the jury with CALJIC No. 2.90.

7. *The instruction on expert testimony was proper.*

Savala contends the trial court erred in instructing the jury with the portion of CALJIC No. 2.80 (expert testimony) that discussed how to evaluate the evidentiary basis of expert testimony. There is no merit to this claim.

Savala's jury was instructed: "An expert witness is permitted to consider the statements made to the witness or a third person that have not been made under oath in court. [¶] Statements considered by an expert witness which were made to the witness or a third person do not prove what was said was true. The truth of those statements may come from other evidence. You should consider the failure to prove in court that it was made or is true in determining what weight to give to the opinion of the expert." Savala argues this language improperly allowed the jury to consider as evidence information that the gang expert relied on in concluding Savala was a gang member. Savala asserts this violated his confrontation clause rights under *Crawford v. Washington* (2004) 541 U.S. 36 [124 S.Ct. 1354] (*Crawford*).

22

"In *Crawford v. Washington* (2004) 541 U.S. 36 [124 S.Ct. 1354] . . . , the United States Supreme Court announced a new standard for determining when the confrontation clause of the Sixth Amendment prohibits the use of hearsay evidence – i.e., an out-of-court statement offered for its truth – against a criminal defendant. *Crawford* held that this clause protects an accused against hearsay uttered by one who spoke as a [witness giving testimony] [citation] if the declarant neither takes the stand at trial nor was otherwise available for cross-examination by the accused." (*People v. Cage* (2007) 40 Cal.4th 965, 969.) *Crawford* held that " '[w]here testimonial statements are at issue, the only indicium of reliability sufficient to satisfy constitutional demands is the one the Constitution actually prescribes: confrontation.' [Citation.]" (*People v. Cervantes* (2004) 118 Cal.App.4th 162, 172.) "*Crawford* recognized that if the statement in issue is nontestimonial, the rules of evidence, including hearsay rules, apply. *Crawford* stated: 'Where nontestimonial hearsay is at issue, it is wholly consistent with the Framers' design to afford the States flexibility in their development of hearsay law . . . . ' [Citation.] Thus, state courts may consider 'reliability factors beyond prior opportunity for cross-examination when the hearsay statement at issue was not testimonial. [Citation.]' [Citation.]" (*Id*. at p. 173.)

According to our Supreme Court, *Crawford* "adopted this general rule: The prosecution may not use '[t]estimonial statements' of a witness who does not appear at trial, unless the witness is unavailable to testify and the defendant had a prior opportunity for cross-examination. [Citation.]" (*People v. Dungo* (2012) 55 Cal.4th 608, 616.) "Although the high court has not agreed on a definition of 'testimonial,' testimonial out-of-court statements have two critical components. First, to be testimonial the statement must be made with some degree of formality or solemnity. Second, the statement is testimonial only if its primary purpose pertains in some fashion to a criminal prosecution." (*Id*. at p. 619.)

In the gang context, expert witnesses often gather the information they rely on from non-testimonial sources.[7]  As explained in *People v. Valadez* (2013) 220 Cal.App.4th 16, 35-36:  "[U]nder any definition of 'testimonial' the general background information [the expert] obtained from gang members, other officers, and written materials on the history of the El Sereno and Lowell Street gangs plainly does not qualify.  [The expert] testified he simply talked to experienced officers, read materials, and discussed the gangs' history in casual, consensual encounters with gang members in order to learn more about the history of the gangs, which gang expert witnesses almost surely must do to become qualified as experts. . . .  [¶]  Further, nothing in the circumstances of [the expert's] interactions with gang members and other officers objectively indicates the primary purpose of [the] questioning was to target appellants or any other individuals or crimes for investigation or to establish past facts for a later criminal prosecution. . . .  Day in and day out such information would be useful to the police as part of their general community policing responsibilities quite separate from any use in some unspecified criminal prosecution.  Further, nothing in the consensual encounters with gang members or officers suggests they might have reasonably understood [the expert's] primary purpose was to use their statements in a later prosecution."  Savala has not identified any relevant out-of-court statements that were elicited in circumstances different from those described in *Valadez*.

Moreover, confrontation clause error is reviewable for harmless error under the *Chapman*[8] standard of harmless beyond a reasonable doubt.  (*People v. Mitchell* (2005) 131 Cal.App.4th 1210, 1225; *People v. Martinez* (2003) 113 Cal.App.4th 400, 410; *People v. Schmaus* (2003) 109 Cal.App.4th 846, 859.)  Savala could not have been prejudiced because, entirely apart from the gang expert's testimony, the jury heard from

---

[7]     Our Supreme Court has granted review in *People v. Sanchez* (2014) 223 Cal.App.4th 1 (review granted May 14, 2014, S216681) in order to decide if, under *Crawford*, a defendant's Sixth Amendment right to confrontation was violated by a gang expert's reliance on testimonial hearsay.

[8]     *Chapman v. California* (1967) 386 U.S. 18 [17 L.Ed.2. 705].

two other witnesses who knew that Savala was a gang member, i.e., Flores and Toscano. As for other aspects of the gang expert's testimony that may have relied on hearsay (e.g., the type of activities engaged in by the Orchard Street gang), they are irrelevant because we have already determined there was insufficient evidence to sustain either the gang enhancement or the gang special circumstance finding.

The trial court did not err in instructing the jury with CALJIC No. 2.80.

8. *Evidence of prior inconsistent statements did not violate Savala's right to confrontation.*

Savala contends the trial court violated his confrontation clause rights under *Crawford* in admitting the prior inconsistent statements of two witnesses (Gutierrez and Flores) who claimed memory lapses when they took the stand at Savala's trial. We disagree.

As Savala acknowledges, *Crawford* is inapplicable because Gutierrez and Flores testified at trial and were subject to cross-examination. (See *United States v. Owens* (1988) 484 U.S. 554 [108 S.Ct. 838] [even loss of memory does not render witness unavailable for Confrontation Clause purposes]; *People v. Cowan* (2010) 50 Cal.4th 401, 468 [*Owens* concluded "that 'when a hearsay declarant is present at trial and subject to unrestricted cross-examination,' [the] 'traditional protections of the oath, cross-examination, and opportunity for the jury to observe the witness'[s] demeanor satisfy the constitutional requirements,' notwithstanding the witness's claimed memory loss about the facts related in the hearsay statement" and "[n]othing in *Crawford* casts doubt on the continuing vitality of *Owens*"].)

As for Savala's complaint that the jury should have been instructed "they had to find that a witness's claim of lack of recollection was feigned or deliberate in order to be considered inconsistent with the former statements," this is the kind of preliminary fact that is to be determined by the trial court under Evidence Code section 405, not the jury. (See *People v. Tewksbury* (1976) 15 Cal.3d 953, 966 [when deciding if collateral factual matters bring statement within a hearsay exception, trial court "finds the existence or nonexistence of the preliminary fact"].) "The initial decision of whether the required

25

facts exist to permit admission of statements under an established hearsay exception is vested in the trial court's discretion. Its ruling will not be disturbed unless those facts are not supported by a preponderance of the evidence." (*People v. Rios* (1985) 163 Cal.App.3d 852, 863.)[9]

The trial court did not err in admitting the prior inconsistent statement evidence.

9. *No cumulative error*.

Savala contends his convictions must be reversed for cumulative error. We have reversed both the gang enhancement and the gang special circumstance findings for legal error. Other than that, we have found no errors and, therefore, the claim of cumulative error fails. (See *People v. Seaton* (2001) 26 Cal.4th 598, 639; *People v. Bolin* (1998) 18 Cal.4th 297, 335.)

---

[9] *Rios* applied the *Tewksbury* rule to the admission of prior inconsistent statements: "Under this exception to the hearsay rule, a court may allow earlier statements of a witness in evidence to prove the truth of their content where they are inconsistent with matters to which the witness testifies at trial. The inconsistency may either be express or implied, and will be deemed implied where the court finds a witness falsely claiming failure to remember facts in order to deliberately avoid testifying as to those facts. [Citations.]" (*People v. Rios*, *supra*, 163 Cal.App.3d at pp. 863-864, fn. omitted.) Here, the record demonstrates there was ample reason to believe that Flores's and Gutierrez's claims to be suffering from memory loss were false. Flores's initial claims of complete memory loss prompted this exchange when he was asked how he felt about testifying: "A. I'm not testifying. [¶] Q. You don't want to testify? [¶] A. Fuck, no." Although Gutierrez answered some questions, she allegedly suffered memory loss when asked about crucial details. Gutierrez admitted the authorities had forced her to attend the trial and she acknowledged she was "afraid because of what [she] saw that day."

## DISPOSITION

Savala's gang enhancement and gang-murder special-circumstance findings are vacated. The stayed 10-year gang enhancement terms are vacated. As modified, the judgment is affirmed. Savala's consecutive life-without-possibility-of-parole terms are independently grounded in the multiple-murder special-circumstance findings and are, therefore, unaffected by the reversal of the gang-murder special-circumstance findings. The trial court is directed to prepare and forward to the Department of Corrections and Rehabilitation an amended abstract of judgment.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

EDMON, P. J.

We concur:

KITCHING, J.

EGERTON, J.[*]

---

[*] Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.